**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 240702-U

Order filed April 7, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0702 Circuit No. 24-CF-274 |
| | ) | |
| MICHAEL A. CERVANTES, | ) ) | Honorable Howard C. Ryan Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Peterson and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1   *Held*:  The evidence was sufficient to prove defendant guilty of aggravated battery of a child beyond a reasonable doubt.

¶ 2   Defendant, Michael A. Cervantes, appeals his conviction for aggravated battery of a child. Defendant contends that the State failed to prove him guilty beyond a reasonable doubt, arguing that the State presented insufficient evidence of the required intent. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4 The State charged defendant with aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2024)). Specifically, the State alleged that defendant was at least 18 years old when he knowingly caused great bodily harm to M.C., a child under the age of 13, by forcefully grabbing M.C. and "body slamm[ing] him against a surface resulting in a humerus spiral fracture." The matter proceeded to a jury trial on October 1, 2024.

¶ 5 At trial, Katie Cervantes testified that on May 1, 2024, she lived with her husband, defendant, and their two children. Their son, M.C., was five years old on that date and approximately 3½ feet tall and 55 pounds at the time of trial. Defendant was 33 years old. On the night of the incident, Katie, defendant, and the children had returned home at approximately 8 p.m. Defendant began play fighting with the children in his and Katie's bedroom. Katie explained this was a common activity and that M.C. was a bit "rambunctious." Katie told defendant and the children that it was time to get ready for bed. M.C. left the bedroom, and defendant was lying face down on the bed. Approximately two minutes later, M.C. ran back into the bedroom and "punche[d]" defendant in the groin area. Defendant stood, and Katie observed that he was "in pain and angry." Defendant chased M.C. into the living room. From the bedroom, Katie "heard a smack and [M.C.] say[ ] ow. Why did you do that." M.C. ran back into the bedroom, and defendant followed. Defendant caught M.C. and picked him up by his arms "[p]retty forcefully." Defendant "flipped [M.C.] over on to the bed" where M.C. landed on his arm. Katie described the bed as soft. She observed that M.C.'s arm appeared broken. Katie held M.C. and told defendant to stay away. Defendant tried to manipulate M.C.'s arm back into place while M.C. cried.

¶ 6 Katie immediately wanted to take M.C. to the hospital, but defendant was concerned about the Department of Children and Family Services (DCFS) and going to "jail for a long time." To avoid DCFS involvement, defendant suggested that they say M.C. fell off a trampoline. Katie

agreed because she was "afraid," and wanted M.C. to receive medical attention. On their way to the hospital, defendant told the children to indicate that M.C. had fallen off a trampoline and broken his arm. At the hospital, defendant spoke on behalf of the family and recited the trampoline story to hospital staff. Katie remained "quiet or nodded and agreed." When medical staff asked to speak with M.C. alone, defendant became "pretty upset and started saying this is not what we're here for. *** [I]f you guys aren't going to treat him we're going to leave." M.C. was treated for his broken arm. The following day, Katie spoke with Abby Ludwig, a DCFS investigator. Initially, Katie repeated the trampoline story because she was afraid. Later, Katie informed the investigator that defendant had flipped M.C. onto the bed, causing his arm to break.

¶ 7    On cross-examination, Katie stated that M.C. was an "[e]nergetic" five-year-old boy who sometimes played "a little bit rough" which often involved play fighting. When Katie spoke to the police the day after the incident, she stated that defendant was play fighting and wrestling with the children, taking turns picking the children up and "toss[ing]" them onto the bed. Katie agreed that defendant was "[j]ust playing around" and "[u]ntil a very specific moment everything seemed fine." M.C. had never been injured in this way before. Katie was surprised and observed that defendant was in shock following the injury. At the time, Katie believed it was an accident. Katie admitted that she never told the police that defendant only agreed to take M.C. to the hospital if they said M.C. fell off a trampoline. On redirect examination, Katie stated the roughhousing that led to M.C.'s injury was different because "this occasion it was out of anger." Katie explained that defendant "angrily grabbed" M.C. "fast and hard" as opposed to "just" play fighting when defendant used a "gentle toss."

¶ 8    Dr. Ryan Gluth testified that he was an emergency medicine physician who treated M.C. at the hospital. Gluth was initially informed that M.C.'s injury occurred from "jumping on a

3

trampoline with three of his friends" approximately 30 minutes before arriving at the hospital. Following an X-ray, Gluth determined that M.C. had a spiral fracture of the right humerus—the bone that connects the shoulder joint to the elbow. Gluth agreed that the humerus bone was a "relatively difficult bone to break." Gluth described the injury as "a twisting-type mechanism of injury." Gluth noted that the type of injury was a "red flag[ ]" for a nonaccidental injury or abuse. In an attempt to rule out a nonaccidental injury, Gluth asked to speak with M.C. alone. Initially, defendant became agitated and refused to leave the room. Eventually, defendant left, and M.C. told Gluth that the injury occurred in the morning, which differed from the previously reported version of events. On cross-examination, Gluth agreed that falling "with an outstretched hand" could have caused M.C.'s injury. Gluth could not provide an opinion as to the amount of force required to break a humerus bone.

¶ 9     Ludwig testified that she interviewed Katie and defendant. Ludwig met with Katie at her residence. After speaking with Katie, Ludwig contacted defendant by phone, which was recorded by an officer's body camera. In the recording, defendant is heard saying that he and M.C. were "wrestling and [he] went to *** body slam [M.C.] on the bed and *** he put his arm out *** as he went down." When Ludwig asked how he picked M.C. up, defendant stated, "from the middle of his legs ***. You know, like a body slam, picked him up, boom." When asked why defendant did not inform the hospital of this version, defendant responded, "because I'm scared," and "all you all want to do is take me out of my kids' life." Defendant denied telling M.C. to lie about how he was injured. Defendant claimed that the incident was an accident and he never intended to hurt M.C. On cross-examination, Ludwig indicated that she was aware that defendant had been previously convicted of a felony domestic battery offense where defendant "smacked" M.C., claiming he was disciplining M.C. for stealing candy.

4

¶ 10        During the jury instruction conference, defense counsel requested the lesser included offense of reckless conduct instruction, which the court allowed. In closing argument, defense counsel argued that the evidence supported defendant's claim that M.C.'s injury was an accident. The court instructed the jury that "a person charged with aggravated battery of a child may be found (1) not guilty of aggravated battery of a child and not guilty of reckless conduct; or (2) guilty of aggravated battery of a child; or (3) guilty of reckless conduct." The court also instructed the jury that "[a] person commits the offense of reckless conduct when he recklessly performs an act which causes great bodily harm to another person" and "the defendant cannot be guilty of aggravated battery of a child and reckless conduct." Finally, the court instructed that only the jury were "the judges of the believability of the witnesses and the weight to be given to the testimony of each of them." The jury received verdict forms for both aggravated battery of a child and reckless conduct. The jury found defendant guilty of aggravated battery of a child, and the court sentenced defendant to 10 years' imprisonment. Defendant appealed.

¶ 11                                II. ANALYSIS

¶ 12        On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of aggravated battery of a child, where it failed to demonstrate that he knowingly or intentionally caused M.C.'s injury. When a defendant makes a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985). "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

5

Thus, we afford great deference to the trier of fact, "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). We will not retry a defendant and must allow all reasonable inferences from the evidence in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. A judgment will not be reversed "unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 13 To prove defendant guilty of aggravated battery of a child, the State had to establish that defendant knowingly and intentionally caused great bodily harm by "body slamm[ing] [M.C.] against a surface resulting in a humerus spiral fracture." See 720 ILCS 5/12-3.05(b)(1) (West 2024). Defendant limits his argument solely to whether the State proved the requisite intent to support a finding of guilty.

¶ 14 Here, the evidence showed that defendant was in pain and angry when he chased and grabbed M.C., picked him up and forcefully "body slam[med]" him onto the bed, resulting in M.C.'s broken arm. Katie testified that defendant acted "fast and hard," "out of anger," and was not just play fighting. While Katie initially lied to DCFS about how the injury occurred, her testimony at trial was supported by Gluth's testimony. Specifically, Gluth stated that the humerus bone was a "relatively difficult bone to break." While Gluth could not speculate as to the amount of force required to break a humerus bone, there is a reasonable inference that the force defendant used to body slam M.C. was significant enough to cause his arm to break even when landing on a soft surface. Moreover, Gluth indicated that because the injury was caused by "a twisting-type mechanism," it was possible that M.C. landing on his arm, contributed to the injury. While defendant may not have known that M.C. would land on his arm, the act of body slamming M.C.

6

resulted in the "probable consequence" that M.C. would land on the bed in a way that would cause great bodily harm. See *People v. Hickman*, 9 Ill. App. 3d 39, 44 (1973) ("[W]here one in the commission of a wrongful act commits another wrong not meant by him, or where in the execution of an intent to do wrong, an unintended act resulting in a wrong ensued as a natural and probable consequence, the one acting with wrongful intent is responsible for the unintended wrong."). In other words, based on the totality of defendant's conduct, the jury could reasonably infer that defendant knew with practical certainty the extent of harm his actions would inflict.

¶ 15    Importantly, the jury was presented with the option of finding defendant's conduct reckless instead of intentional. It was provided with defendant's statement that he believed the injury was an accident and he did not intentionally hurt M.C., defense counsel argued that the evidence supported an accidental injury, and it was given the option of finding defendant guilty of the lesser included offense of reckless conduct. Nonetheless, the jury returned a guilty verdict for aggravated battery of a child, specifically finding defendant knowingly and intentionally caused great bodily harm. In doing so, the jury implicitly found incredible defendant's version of events when considering his hesitation to be truthful about the nature of the injury, the fabricated story, his admission to "body slamm[ing]" M.C., and the extent of M.C.'s injury. *Supra* ¶ 14; see *People v. Walker*, 2020 IL App (4th) 180774, ¶ 93 (lying is evidence of consciousness of guilt); see also *People v. Phillips*, 2015 IL App (1st) 131147, ¶ 22 (identifying the reason why a defendant exhibited guilty behavior is a question of fact determined by the trier of fact). We see no reason to substitute our judgment for the trier of fact's credibility determinations. See *Jackson*, 232 Ill. 2d at 280-81. Where the evidence demonstrates that defendant, a 33-year-old grown man, chased, angrily grabbed, and body slammed M.C., a small 5-year-old child, onto the bed, it can reasonably be inferred that the bodily harm caused was knowing and intentional. See *People v. Monteleone*,

7

2018 IL App (2d) 170150, ¶ 26 ("Knowledge, as an element of a criminal offense, is a question of fact for the trier of fact to decide."). After reviewing the evidence, in the light most favorable to the State, we conclude the evidence was sufficient to sustain defendant's conviction for aggravated battery of a child.

¶ 16                                                 III. CONCLUSION

¶ 17            The judgment of the circuit court of La Salle County is affirmed.

¶ 18            Affirmed.